We're happy to have you here today, and we will hear from Mr. Ellis. May it please the Court. Good morning, Your Honors. I'm Michael Ellis on behalf of the appellant, Mr. Ben Lee. As noted in my attorney acknowledgment, I'm going to reserve five minutes of my time for rebuttal. This case involves the granting of summary judgment in an executive employment dispute. Specifically, Mr. Lee was the chief human resources officer for defendant-appellee Exeter Finance Corporation. Now, a number of claims were asserted in the underlying district court litigation, but we're before this panel today to address a subset of those claims in which the district court erred by granting summary judgment when it resolved factual disputes in favor of—resolved unresolved factual disputes. This court should reverse and remain with respect to four issues. First, the district court erred in granting summary judgment in finding that the PIUs or profit interest units had no value when there's evidence in the record showing that those profit interest units, in fact, had a non-zero value. Is there evidence of fair market value in the record? I'm sorry, Your Honor? Is there evidence of fair market value in the record? So there's evidence of value depending on how it's defined, either fair market or fair market value or fair value. The point is that there's evidence in the record provided by Exeter themselves. There's valuations provided throughout the period in which Mr. Lee was being recruited and during the time in which Mr. Lee was actually employed by Exeter, all assigning a value. But the contract required fair market value, correct? That's correct. So the contract sets forth, and that's the PIU agreement, sets forth the methodology of determining the value of the PIUs, and it calls for fair market value looking at the business on a going concern. And Exeter and then the underlying district court spent considerable time trying to create the distinction between the fair market value calculation and potential other calculations. And the issue we have is that Exeter's valuation of fair market value is a single one-page conclusory allegation that it's $0. And whether that valuation was performed with the methodology under 4.3 or a different methodology is really unknown because we didn't get to see their work. But wouldn't you have gotten to depose their expert if you had been in the normal timing? So you could have gone behind that? And normally also wouldn't you have had your competing experts that said the valuation on this date is X number and then there would be a fact issue for sure? So there's two questions, I guess. One is, weren't you permitted to ask questions about the valuation if you had done it in a timely manner, not you personally? And also, couldn't this problem that is presented have been easily solved by an expert who gave the valuation using the proper methodology in a timely manner? Yes, Your Honor. To address the first question about challenging Exeter's method of calculating fair market value according to 4.3, that was an area of great dispute and concern. There was discovery sent to Exeter asking for them to show their work, show how did you get to the $0 valuation. And those questions were never really answered. There was no evidence showing how that calculation was made. But they were not deposed? When you sit down with them and you say, well, this number here, where did that come from? And this number there, what's the backup data for that? Isn't that the normal way you get that if they don't? I'm sorry. No, go ahead, I'm sorry. Yes, Your Honor, absolutely. In terms of their indisputably, we prefer that the factual record relating to the method of calculating the fair market value according to Section 4.3 of the PIU agreement is lacking, frankly, for both sides. That's, I think, what's the underlying issue here. We're resolving summary judgment. Again, they're moving on our breach of contract claim with respect to the PIU agreement saying that we have put forth no evidence. There's no issue of material fact with respect to whether the PIUs had a non-zero value. And at this stage, because we didn't get to see their work, because we – But again, I don't think it's non-zero. I think it's fair market. You're bringing a breach of contract claim. The contract term is fair market value. I don't think the issue is whether it had a non-zero value but what the fair market value was. I agree with that, Your Honor, with the exception of the fact that the only evidence we have of the fair market value from Exeter is that zero value. So that's why I keep mentioning non-zero. If we had seen their work, if we had seen how they came to that $0 valuation, then that could have been challenged and that could have been a question. But the only evidence we have is that single one-page document saying that it's worth $0. And so for summary judgment, where all we have to show is that there's a question about whether that $0 valuation is correct, by pointing to the evidence – and again, the evidence is all from Exeter. The evidence of non-zero values are not speculation. It's not created by Mr. Lee or his litigation team or his Exeter – or excuse me, by his expert. It was all evidence of those same PIUs. There's no question that they're valuing the same PIUs. All of those PIUs were always valued at a non-zero – always valued at non-zero throughout the time period. What is the closest one in time to the relevant date? These other documents. Yes, Your Honor. So there's a series of reports. They're the internal auditor reports. Excuse me. It's a third-party auditor. And they have valued these PIUs against the same PIUs yearly for several years preceding the time period. So what's the closest in time? Yes, Your Honor. So December 30th, so about three months before the valuation provided by defendants under Section 4.3, those third-party auditors had valued the PIUs at a non-zero value. And I understand – But they used these Monte Carlo simulations, which is different than fair market value. Well, yes. It's different in the sense that the methods described appear to be different in terms of one uses Monte Carlo values. Many different scenarios looking forward. And the Section 4.3 of the contract looks at, you know, it's a going concern. Everybody had an arm's length transaction. But it's unclear whether those are simply distinctions or whether those actually lead to differences. There's no evidence in the record, and again, this is on their motion for summary judgment, showing that the fact that Section 4.3 calls for a particular methodology, which they refer to fair market value, and these auditor reports use a fair value methodology, that those will actually lead you to such disparate results, that one will create the value of the PIUs being $0, where the other one always, always has a value on the PIUs. And I think that's what's important here, and that's what our point is with respect to whether there's a genuine issue of material fact, that at all points in time, Exeter, not Mr. Lee, but Exeter applied a value to those PIUs. Both when they were trying to recruit them, the testimony of the executives at Exeter have said that those PIUs have value, and then also by those third-party auditor reports that we previously discussed. At no point in time was the valuation given as $0, except for when Exeter actually had to pay money on that valuation. And then they probably just won this one-page conclusory. I had the impression, perhaps flawed, that your client was the plaintiff. Is that wrong? No, my client is the plaintiff. That's correct, Your Honor. Well, good. So what did he put forward? I'm sorry? What did he put forward? So he put forward, again, it's the evidence presented by Exeter, which begins with a one-page valuation, a spreadsheet that was provided to him during the recruitment process by Exeter's then-CEO, Mark Floyd, who was the person recruiting Mr. Lee. And that valuation had a series of values applied to the PIUs, depending on certain exit scenarios. And those values were not zero, and they weren't even insignificant. On the low end, they were valued at $500,000. And at the high end, they were valued at $5 million. So that's one piece of evidence. And also during the discussion. And that evidence was relevant to the financial statements? That evidence was relevant both to whether the valuation of the PIUs had been valued. No, but I mean from the standpoint of the defendant here, why it was relevant both with respect to this contract, but also with respect to their financial statements, right? Correct. And that was the defendant's representation to people outside of their company and to someone that they're trying to recruit, saying that these PIUs have these values, depending on the exit values for the parent company. And so at no time would they say, you know, these values range anywhere from no value to a significant value. That's not what was represented. They said they valued from $500,000, a considerable value, up to a multiple of that, $5 million. And so that valuation was what they believed, or at least that's what they were telling everybody they believed. So your case, you're going to prove your case by using their evidence, right? Correct. That's your plan? Yes, Your Honor. So there is credible evidence that can be presented to the jury, both in the form of that one-pager testimony by the executives and the audit reports that we've discussed, that provide a range of values for those PIUs. And that's admissible, credible evidence, and the jury can determine whether the PIUs in fact had a value as opposed to a zero value, which is the only evidence that's really been presented for Exeter in favor of their plan. I'm sorry? It sure would have been easier to have an expert applying on the relevant date in the relevant methodology, wouldn't it have been? I will stipulate strongly to that, Your Honor. It would have been much easier to do that. How long was the statement, the recruiting statement, isn't it a couple years before the recruiting statement, the puffed, whether it's accurate or not, the recruiting statement? Isn't it two years, or is it three years? How long out was it? So that was presented to Mr. Lee in July of 2013 during the recruitment period, and then when his employment was terminated, it was in March of 2015, really February of 2015. So almost two years. So not quite two years, yeah, okay. That's correct, Your Honor. And that valuation was a projection going forward based on what the value of those PIUs had, but it's important to recognize that this was not some speculative valuation, some unforeseen date in the future. Mr. Lee, and this is part of our fraud claim, asked several questions. He said, I need to see the data. I need to see the backup. Where do these PIUs that are supposedly worth millions of dollars, where is this coming from? And that's when he was presented to one pager. And that's also where Mr. Floyd, again, the then-CEO of Exeter who was recruiting Mr. Lee, also pointed out that there was a time period in which these PIUs would be recognizing value. Mr. Floyd explained to Mr. Lee that the typical time period in which these PIUs would gain value was about four or five years from when the investment company came in. But they're also very volatile. PIUs are very volatile, aren't they? And the company was doing very poorly. And he knew that the longer he was there. Yes, Your Honor. And that goes right into our fraud claim in the sense that they were represented for being $500,000 to $5 million. And then when he gets into the company, he's shown that the financial state of the company is not nearly what it was. But it's important to recognize that even during this time period when the PIUs were essentially, there was lots of volatility when the company was not doing so well, those same auditor reports that we discussed a few minutes ago, they still valued those PIUs at something more than $0. If the company was doing as poorly as now Exeter is claiming it was doing, it would be reasonable to believe that the PIUs internally with their own financial auditors would be valued at $0. And at no time, and I think that's really the takeaway when it comes to the value of these PIUs and where we are in this case with respect to summary judgment, every piece of evidence points to the PIUs at least having some value. Except for at the one time when Exeter had to pay on that value and then they gave it $0. And again, we don't get to see their work. Now you have three other arguments and not quite three minutes, so. I will try and speak a little slower, but I'll try and get through it, Your Honor. So with respect to the severance agreement, the court dismissed that claim, granted summary judgment, because it found that there was no agreement between the parties as to the material terms. But in fact, as the evidence shows, there's evidence in the record both in terms of the communications between Mr. Lee and Mr. Floyd and then also e-mails and then the offer letter. The parties had agreed on those material terms. It's an exchange of severance set at a specific amount paid over a specific time in return for an agreed upon non-competition. Subject to conditions. Subject to terms and conditions. And so you had to meet the terms and conditions, which means signing the sheet that had the additional terms and conditions on it. Correct, Your Honor, but there's evidence in the record in the form of Mr. Lee's affidavit, and that's on page I believe it's 1819 of the record, where Mr. Lee has testified that at no time was he told that he's going to be having to sign this later presented severance and non-compete agreement that's going to have new material terms. What did he think the terms and conditions that it's subject to was going to include? Of course it was going to be things that were probably in order to the benefit of the company. The terms and conditions. He certainly couldn't have believed that those were just simply contract terms, whether the contract's going to be executed in multiple subparts, a choice of law provision, things of that nature. His point is that, and really our point is that, there was a bargain for exchange, severance in exchange for non-competition, and then months later, during the middle of his employment, not when he was leaving, but during the middle of his employment, Exeter tried to change the deal. They came in with these new materials. Isn't he the head of HR or something? Chief Human Resources. So he should be really savvy about how these severance agreements work, shouldn't he? I cannot speculate on the savviness and how the severance agreement worked, but I think what's important for purposes of this dispute were on summary judgment, whether it was a question of fact as to if the parties had agreed for severance and non-competition, that Mr. Lee has testified, and that's been unrebutted. I think it's important to recognize that. There's no allegation from Exeter that he, being Mr. Lee, had been informed that he was going to have to sign a different severance and non-competition agreement that's going to contain new material. What are your other two points of error? Quickly. My time is over. What are your two points of error in one sentence each? Yes, so the district court was erred in granting summary judgment on Mr. Lee's alternative claim to recover the severance for quantum merit because Mr. Lee did not act with unclean hands, and then with respect to the fraud claim, the district court erred in finding that Mr. Lee did not reasonably rely on Exeter's representations, both to the value of the profit interest units, the PIUs, and then also whether or not he would be receiving severance. Thank you. Thank you. You've saved time for rebuttal. Thank you. I think you have to take that off. Yeah, and Mr. Dunn puts his on, and it's all a process. I took too much. There we go. May I close your arm? You may. He's having a second to get set up. Ready? Yes, sir. One thing I agree with that the appellant said several times, there's no evidence whatsoever that the PIUs are worth anything other than zero when using the fair market value. And remember, there's two things that the appellant and the appellant's expert never proved. One, they never created a fact issue as to the fair market value. Two, they never provided any evidence whatsoever as to the fair market value as of the call date. And that's important because we have a contract. They're suing under the contract. They have to live up to the terms. Do you agree that if the question were, is the valuation zero, they might have created a fact issue? No, because at that point, unless there's evidence to contradict that, there's no fact issue that the value is anything other than zero using fair market value as of the call date. Okay, so you don't think that the audit casts any doubts to the reliability? Not when you dissect it. Okay, what do we know about the audit? It was performed as part of GAAP and financial reporting. Two, they used a different methodology, the Monte Carlo method, which has a million pass for a million different valuations. Number three, the Duff and Phelps audits were not as of the call date. So the fact that there may be a different valuation for a different purpose on a different day does not create a fact issue when the contract is clear. Is it not a jury question that it might be unlikely for it to be valued at zero when just a couple months later, earlier it was valued significantly higher? Why doesn't that create some wiggle room? Well, first of all, that was three months before. That was not using the fair market value. So you can't say the contract says this is how you value some piece of equity. But hey, somebody else way over here used a different method on a different day and they came up with a smaller different number and say somehow you can bootstrap that in to a contract claim. It just simply isn't there. Why isn't the fraud claim viable if the head guy is touting the really high valuations and giving assurances about four years hence? Right. You have to take it in the context of which that conversation occurred, right? There are numerous words that the district court focused on. This is subject to. There were hypotheticals of potentials. Subject to other agreements, programs, terms, and conditions. And as you noted, he is a CHRO. He is very sophisticated. He had equity at old co. So he was well aware when someone says this is a projection of something that could happen, that might happen if we have targets. And, of course, that was almost two years before the date of the firing and the call date. So a lot can happen. Not only are PIUs volatile, this is a volatile company. They are loaning subprime on autos to an underserved market. So setting aside PIUs being volatile and risky, and recall that even Mr. Lee testified that he knew that these were risky. So not only was he sophisticated, he knew they were at risk. And guess what? This was a risky business because if the economy goes down, the demand for used cars can go up or down accordingly. So it was a very volatile situation on multiple fronts. And accordingly, he knew with those words of could be possible, et cetera, that it wasn't a guarantee. And there were certainly, I also recall, he says he asked for additional information, and they didn't give it to him. Yet he proceeded forward with signing the letter agreement. Also, don't forget that ten months after Lee started working, after he got access to all these financials as a C-level executive, what did he do? He signed an amended PIU. So I think there's ratification at a minimum, certainly if he thought, well, I've been defrauded. Now I've looked at the financials, and my goodness, I've been sold a pig and a poke or whatever that old saying means. It's an English saying, by the way. He bought a pig and a poke. Why did he sign up again? Why didn't he say, you lied to me. This company is worth nothing. I'm quitting, and I'm suing. Call the PIUs. Instead, he doubled down and signed an amended agreement. And we know he had the wherewithal to sign or not sign an agreement because he refused to sign the, when they gave him the severance agreement, he refused to sign that. When they presented him with the non-compete and the severance after he started, he refused to sign that. So we're dealing with a sophisticated, intelligent, experienced C-level executive, and this ain't his first rodeo with PIUs and equity interests. So, and by the way, he tries to say, well, that somehow there's evidence that it was some evidence in the record that it was worth, PIUs were worth more than zero. Okay. We know that the call had them at zero. Evans testified that they were worth zero, and Nall testified that they were worth zero. They cherry-picked some language in a depot about, well, I think they might be worth something someday, but that is not any evidence that at the call date they were worth anything other than zero. In fact, the evidence is quite to the contrary. What about his argument that the methodology is really thin? Well, I don't know what the, you know, thin, thick, or in the middle. The contract is what it says it is. There's no evidence whatsoever that there's ambiguity in the contract such that we would look elsewhere or look to parole evidence, and, of course, that isn't even an allegation they made at the district court level. So you may say, I don't like the valuation. I don't like the methodology. Well, Mr. Lee, you shouldn't have signed up for this job when you knew and you had the agreement that said 4.3 is, we're going to use fair market value as of the call date. So, you know, you can't change the rules of the game after it started to suit your purposes. And I think it's important to remember that even Lee's expert, this call valuation he had prior to filing the lawsuit, his expert had it from day one, and they never once attacked that. Instead, what did the expert do? He grabbed an illustration that Lee was provided for when he was being recruited. An illustration said, well, if this, then this happens. If this, then this happens. And about two years later, that didn't happen, and he wants to complain. And the judge threw out that valuation methodology by that expert. And that's the judge's prerogative under Doebert as a gatekeeper for junk science and junk opinions. And, you know, then they go back and say, oh, my goodness, well, we're going to file a supplemental evaluation, and that was too late, and the judge is entitled to control their scheduling order docket, and he excluded it under Doebert or the scheduling order. But then, remember, the district judge went even further, and in the summary judgment said, even if I had and considered the evidence or the new valuation tried by a plaintiff's expert, it doesn't fly because it isn't based on fair market value. It isn't based on the time of the call. So, again, it doesn't create a fact issue. What they had historical financial statements in the evidence in this case? I believe they had three audits from Duff and Phelps that were for a different purpose, using a different methodology, not what was required under the contract. So, again, it doesn't really matter if... Wait a minute. Yes, ma'am. What's the use of having an audit if you don't square it up with the method that's called for in the contract? So what did the auditors say? It's the company's financial statements. What did the auditors say about whether they were fairly presented? What the auditors said, using GAAP and the Monte Carlo methodology, that the PIUs had a certain value. But that is not the valuation method under the contract. If we took a different valuation method, let's just say assets, less liabilities, and then you divide the number of PIUs... The auditors would be looking at what's the company's exposure under this agreement, right? No, they were looking at the overall GAAP value of the company. They did not evaluate. That's a very good point. They did not evaluate what the PIUs were worth giving this methodology for this contract with this plaintiff. Did they evaluate overall what the PIUs were worth for all the head executive people? Because that is something they would have to be aware of, wouldn't it? Sure, but my recollection is that there's nothing in the record in that they did not value that PIUs for all executives. And that's not in the record. And by the way, the expert didn't put that in his report, say, I'm going to... Later, when he did an amended report, he tried to get that, and that was excluded. So their only evidence before the court in the summary judgment was their expert's view of an illustration and trying to extrapolate a value not using fair market value to not using fair market value as of the call date. And that's why the judge struck that opinion and said it doesn't create a fact issue. It wasn't the methodology used by their expert was junk, junk science, if you will. You know, I can't remember whether you were the lawyer at trial or not. I took Mr. Lee's deposition. I mean, not at trial, but in the district. Yes, I was. Okay. You know, there are some points made in the brief, and also the district court actually makes some conclusions that there was some untimeliness in disclosures and things and that there was... Your client wasn't always forthcoming quickly. And they have some points that that's partly why they don't have their proper expert reports and things. Do you want to respond to that? Sure. I mean, first of all, here's the issue of the contract. Look over here. Look over there. There was some tough discovery battles. The magistrate, as well as the judge, ordered things produced. They were produced. They didn't file a prompt continuance if they really needed it. It wasn't until their expert opinions were struck that they started scrambling and asking for more discovery. So, you know, the judge was well aware of that. Look, Judge Lindsey runs a tight ship, okay? He's not going to put up with any shenanigans. And he saw their request, oh, we didn't get this, we didn't get that. The point is these issues were known from day one. We produced, and they had the evaluation methodology using fair market value before the lawsuit was filed. They never, I think someone asked, did you ever go to pose the people on the committee that made the decision and how they came up with it? No. They didn't do that. So for them to come say, well, there were some documents out of the thousands and thousands of documents that were produced that we think were produced late or should have been produced earlier, well, they have a remedy for that. That's a file of motion to compel. And they did, and they got everything that they said they needed. And now they're trying to say, oh, well, because we were slow or because the magistrate sanctioned us, that that somehow means they didn't have evidence that they wanted. That's just not the case. So, you know, throw some dirt over here or over there. It doesn't matter. It's the same red herring where they say, oh, the judge said that he was fired for cause. Well, guess what? The issue isn't whether or not he was fired for cause. I mean, there was evidence that he was fired for cause, but even if he quit or even if he had this arrangement with Olco, the point is at the time that he accepted the job with Exeter, he knew he was no longer employed with Olco. He knew that it was going to end in the end of June. He had signed a severance agreement with Olco on June 28th. Guess when he signed our deal? A month later. I believe it was July 28th, 132 days later. So there's no detrimental reliance. There's no fraud claim because he didn't have any other options. All right? And he was sophisticated. And when they gave him the documents, he asked for more documents. They didn't give it to him. He signed anyway. And, of course, we know he signed 10 months later. And we knew he had the wherewithal and intelligence when not to sign because he refused to sign the severance agreement when it came out with more details. He even signed, despite allegedly saying, oh, I see the financials are horrible, this is volatile, I know these are vaulting. He signed an amended PIU 10 months into the job. So all of the detrimental reliance claims and fraud claims are vitiated by his own actions. How would you suggest, how do you wish this court to rule in the quantum merit? Well, I personally think the quantum merit is a Hail Mary. In desperation, he raises that issue. And recall that the district judge said, okay, we're going to give you extra time, appellant, to brief this issue. So he had all the time in the world. If there was additional evidence he needed, et cetera, which I don't believe he asked for any additional evidence on the quantum merit, he had a chance to brief that. And the judge looked at it and said, I don't see anything there. I mean, again, this is not something where you've got an unsophisticated individual that is lied to and doesn't know better and has other options and changed their position. In addition, a separate reason to defeat the quantum merit is exactly what the judge said. He comes to this court asking this court for equity. And what does he have? Unclean hands. He lied to the court in his pleadings. He lied in his deposition. And we know that. And also, when you talk about no evidence, they abandon all of those claims. Rather than come back and say, oh, I testified earlier that it was a mutual agreement for me to leave. And Mr. Dunn has presented the deposition testimony of my boss, saying I was fired for cause two months before you ever entered in to negotiate his action. He doesn't say, oh, that's not true. Recall my prior testimony. He drops all the claims. Do we have to affirm the unclean hands? Or could we rule on that these are subject to contract, and therefore, there's no quantum merit available? Well, as Judge Garza taught me when I clerked the Fifth Circuit, the quickest way to get a judge to do something is to tell him not to do it. So I think that this court can do as it wishes. But I think those are independent grounds. In other words, to create the quantum merit, he has to go outside the contract. I don't think there's a basis for that. But I do think that you have alternative grounds in which to deny the quantum merit. Either, hey, it just doesn't stand on its own two feet, or it's subsumed within the contract claim. Did you have anything else? Maybe I can finish early. Give me one second to review my notes. With regard to that Duff and Phelps audit that Judge King was asking about, I do want to point out that it was a different methodology. There are no specifics in the record indicating that they did any valuation that would in any way be close to the methodology required. You mean the auditors? Yes, ma'am. Yes, ma'am. And the district court noted that even Lee's expert did not adopt or approve the methodology of the auditors. In other words, if the auditor is some silver bullet to wield its way around the contractual provisions of this contract, why didn't Lee's own expert, when he did his first report, say, oh, this is really important. And I'm going to adopt how they did it. Was there anybody else in the firmament here that had a call in effect on this company for PIU's value this way? I mean, is our guy the only guy? As far as I know, our guy is the only guy. I certainly know in regard to the record on appeal he's the only guy. There was no evidence. I mean, and that's a great point. If the plaintiff was to come here and say, well, look, five months before Joe Blow got a valuation of $0.20 a share or since then Jane Doe got a valuation of $0.07 a share, then I think maybe they had something to work with. But there's no evidence in the record of appeal that I'm aware of or in discovery on that issue. Well, and that would make it, you know, whether how many, you used to call them mullets, how many other mullets were out there with the same kind of provision would make a difference on how anxious the auditors were about, you know, tying it down. Sure. Good point. So is there evidence that that's not the way that it worked for the other executives? They did not have the PIUs or they had them valued differently? I understand that there was no valuation for any executive. The valuation is done at the time of the call, okay? And also the other thing is, again, this is not in the record, but we know that the PIU was amended. So, you know, he was operating under one after 10 months in. But I'm aware of no valuation that was done for any other executive. And in fact, the testimony of the general counsel and Mr. Knoll was that I think they're worth zero. So there's nothing, no, despite, remember, that's important too. They deposed it. We let them depose the general counsel. I mean, part of the issue of the discovery dispute is they were asking for pretty broad range of discovery. Now, the magistrate didn't agree with us. They did agree with us on some things, but it wasn't like we were ordered to lose everything. They got about two-thirds and we got about one-third. But they did get the deposition of our general counsel, which is a thorny issue. And both the GC and the executive they deposed said, hey, what do you think the value is? They said zero. So they had full and fair discovery on that issue. I don't have anything else unless you all want to send another question my way. I think we have your argument, counsel. Thank you. Thank you so much. What a pleasure. Thank you. Oh, I think you have to get your little safety thing. Now I know why there were two of them. Thank you. You can have it. What was it? Oh, did I take the... Oh. Yeah, I sure did. We're all learning how these protocols work. So we... Well, thank you. Like I said, we want to accommodate the lawyers where we can and do so safely. So you may proceed. Thank you, Your Honors. Quick points relating to the value of the PIUs. Opposing counsel made several comments relating to the expert reports and how reliable they were and the fact that all of them were struck. But the jury can infer that the evidence presented outside of the expert reports, that Exeter's valuations were calculations done using the fair market value. That's a fair inference by the jury. And the expert reports are not necessary to value those PIUs. I also want to then turn to Mr. Lee's fraud claim relating to the valuation of PIUs. I'm sorry. You're saying the jury could do its own fair market valuation? I missed the point there. Well, the evidence that we discussed before in terms of the different valuations that were done relating to the PIUs by Exeter, that can be presented to the jury and the jury can understand that that evidence can be used to support the jury's understanding of what the fair market value of the PIUs were done at that time. And the point I was trying to make is that the expert reports that have been struck and certainly were lacking at times, those are not necessary for Mr. Lee's claim to survive summary judgment or to present to the jury. That evidence can be presented to the jury with or without an expert report. So with respect to the fraudulent inducement claim, I think it's important for this Court to recognize that there's no question that there were material representations made by Exeter to Mr. Lee. There's no question that Mr. Lee relied on those and that he was harmed. That's not indisputable. Did he ratify? I'm sorry? I'm sorry. No, go ahead. Did he ratify by signing agreements after he had knowledge of the insider information? It seems strange to me that the fact that Mr. Lee decided to try and make it work with the company, that he had the desire to make that employment work, to make that company better, is going to be held against him now, as opposed to what I seem to understand, that if Mr. Lee realized that he had been defrauded, that at that moment he should have said, see you guys later, I'm taking you to court. So the fact that he chose not to do that, he tried to make it work so that everybody at the company could have value in their PIUs, is now going to be held against him. It doesn't seem to be a fair outcome. Well, we're dealing with the legal outcome. So why isn't that evidence of ratification? Because the inducement claim looks at the time period before he joined Exeter, and this is the inducement to join Exeter. And at that time, it's those representations that is what he relied on, but when he made the decision to join, he decided not to pursue other opportunities. And he did, as opposing counsel pointed out, Mr. Lee had questions. He said, I need more information relating to these PIUs. And Mr. Floyd, Exeter's then CEO, provided that information. He backed it up with data. He sent over that spreadsheet that we've discussed several times. He had the general counsel provide a breakdown of how the PIUs work. He provided information on the timing, as we discussed before. So during that time period, when Mr. Lee was being induced to join Exeter, he asked those questions, the questions were responded, and they were backed up by data. I think he has one. I'm sorry. I was saying you had a question. But I thought Mr. Lee had testified that he saw a lot of risk with the PIUs, that in fact there was really, I thought there was testimony that he did not rely on the misrepresentations, alleged misrepresentations, that he kind of viewed the PIU opportunity, as he described it in his deposition, as outlandish. Can you clarify all that for me? So Mr. Lee testified that he questioned the PIUs. Because certainly if someone hands you a one-page spreadsheet and says $500,000, $5 million, this all sounds great. And Mr. Lee said, well, I need to see some data behind this. So he absolutely said, well, wait a second, this is a lot of money. I need to understand where this is coming from. And that's where the reliance comes from. He asked that, and the initial response from Exeter, from Mr. Floyd, was not, well, that's the valuation we have. That's all I can tell you right now. It was, let me break this down, let me talk about how the valuations work, we can talk about how Blackstone comes in and invests in these companies and then has a turnaround time within five years. And so he did have those questions, and those questions were answered and backed up by data. And that's why Mr. Lee ultimately came to the point where he accepted those representations by Exeter. And decided to move forward. And then only later on did he find out that those were not correct. Real briefly, your honors, I just want to address the Quantum Merowith claim. I think there was some questioning about whether the contract claim, whether there's a contract claim or a Quantum Merowith claim. Certainly, from what I understand with opposing counsel, if the contract claim prevails and there was a contract for paying severance, which we believe there was, then the Quantum Merowith claim is only in the alternative. But when it comes to Quantum Merowith, the issue before the district court and this whole question of unclean hands really started from the fact that in defendant's original motion for summary judgment, unclean hands was not raised. They moved for summary judgment. That's an affirmative defense. I see my time is up. I finished my sentence. I'm sorry, your honor. Finish your sentence, but I have a question too. So go ahead and finish your sentence. I was just going to say that the unclean hands is an affirmative defense, and it was not a ground that was moved on by Exeter in the original motion for summary judgment, which is how this issue played out in a very unfortunate manner. Separate and apart from unclean hands, though, if there is a way to get severance under the contract and your client is not complying with that because he's not signing the document and agreeing to the terms, how is Quantum Merowith alternatively available to him? You don't get severance in the air. It's not like he painted a house, and so he has to be paid. Severance is something you get because you get confidential information, and so if he refused to sign the document, I don't understand what legal basis he has for Quantum Merowith. Separate and apart from unclean hands. Yes, your honor. I think that it's because it isn't in the alternative. Again, we believe there is a contract for severance to be paid. But Quantum Merowith is not a fair get for severance because it's nothing he did to get severance. I mean, he was paid for his work, and severance is an extra benefit you get for doing other things. He was paid a salary for his work, but the compensation package for Mr. Lee was not just the salary. It was the salary plus the severance and plus other benefits, and so it was that exchange. So just looking at Quantum Merowith on the basis of the salary is insufficient in this situation because that was not part of the exchange of Mr. Lee agreeing to work for Exeter in exchange for an entire compensation package. Thank you, your honors. Thank you. We have your arguments. The court will stand in recess until tomorrow at 1 p.m. via virtual argument. Thank you.